

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00453-CV

---

WEATHERFORD TEXAS
HOSPITAL COMPANY, LLC D/B/A
WEATHERFORD REGIONAL
MEDICAL CENTER

APPELLANT

V.

KERRY AND LEA RILEY,
INDIVIDUALLY AND AS PARENTS
AND NEXT FRIEND OF BRANDON
RILEY, A MINOR

APPELLEES

----------

### FROM THE 43RD DISTRICT COURT OF PARKER COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Weatherford Texas Hospital Company, LLC d/b/a Weatherford

Regional Medical Center (WRMC) appeals from an order denying its motion to

---

[1]*See* Tex. R. App. P. 47.4.

dismiss the health care liability claims of Appellees Kerry and Lea Riley, individually and as parents and next friend of Brandon Riley, a minor. We will affirm.

## II. Background

According to the expert reports tendered by Appellees, at approximately 10:00 p.m. on December 12, 2007, Lea presented to WRMC in active labor. The attending physician "documented a concerning description of [Lea's] pelvis by noting 'prominent pubic arch, a blunt ischial spine, and a flat sacrum.'" Richard Cardenas, M.D. and Nora Robinson, R.N. assumed caring for Lea sometime during the next morning. At 1:30 p.m. on December 13, 2007, Nurse Robinson documented that Lea was completely dilated but that the "infant [was] not descending well" despite "good pushing efforts" by Lea. At 1:50, 1:58, and 2:10 p.m., Dr. Cardenas applied a vacuum extractor for an attempted operative vaginal delivery, during which time there were multiple "pop-offs."[2] After three failed attempts using the vacuum, Dr. Cardenas delivered Brandon using forceps. Brandon's "condition deteriorated rapidly" after he was admitted to the nursery, and he was transferred to Cook Children's Medical Center, where he was diagnosed with "an extensive and severe cephalohematoma, a skull fracture, both epidural and subdural hemorrhages, a consumptive coagulopathy, a cerebral infarction/stroke, seizures, and acute tubular necrosis."

---

[2]A pop-off is "a break in the suction mechanism, when the pressure of pulling exceeds the pressure generated by the suction device of the vacuum."

Appellees sued Dr. Cardenas and WRMC for damages proximately caused by the defendants' alleged negligence. As to WRMC, Appellees alleged in part that "the nursing staff failed to advocate on behalf of [Lea] and [Brandon] during the labor and delivery of [Brandon]"; "the nursing staff failed to use the hospital's chain of command policy and advocate for a change in the medical plan as required under prudent practice with these circumstances"; "the nursing staff failed to recognize the clinical significance of the long and protracted labor curve during delivery"; "the nursing staff and hospital policies failed to advocate against the use of forceps or vacuum extraction to shorten labor"; and the nurses "fail[ed] to recognize the significance of the document[ed] narrow pelvic arch of [Lea] and the need for a cesarean section delivery when the labor chart indicated cephalopelvic disproportion."[3]

Appellees timely served WRMC with two expert reports authored by L. Justin Gayle, M.D. and one expert report authored by Marina A. Hoffman, BSN, RNC. WRMC filed objections to the reports and a motion to dismiss Appellees' suit. The trial court sustained WRMC's objections to Dr. Gayle's reports on the ground that they were insufficient as to causation regarding the conduct of WRMC, but it denied WRMC's objections to Nurse Hoffman's report and granted Appellees a thirty-day extension to cure the deficiency in Dr. Gayle's reports. Dr.

---

[3]According to one of Appellees' experts, cephalopelvic disproportion is "a condition in which a maternal pelvis is small in relation to the size of the fetal head[,] which makes a safe vaginal delivery difficult or impossible."

Gayle supplemented his two reports, and WRMC filed objections to the supplemental report and again moved to dismiss Appellees' claims against WRMC. The trial court overruled WRMC's objections and denied WRMC's motion to dismiss, and this accelerated, interlocutory appeal followed.

### III. ADEQUACY OF CAUSATION OPINION

In its only issue, WRMC argues that the trial court abused its discretion by failing to dismiss Appellees' claims because in the absence of speculation, conclusory statements, and inferences, Dr. Gayle's report as supplemented does not link the conduct of WRMC's nurses to the harm allegedly sustained by Appellees. WRMC thus contends that Dr. Gayle's report does not constitute a good-faith effort to fairly summarize the causal relationship between WRMC's alleged breach of the applicable standards of care and Appellees' injuries.[4]

We review a trial court's order on a motion to dismiss a health care liability claim for an abuse of discretion. *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986)).

---

[4]To the extent that Appellees asserted direct theories of liability against WRMC in addition to the vicarious liability theories based on the nursing staff's acts or omissions, WRMC does not raise any challenge to Appellees' tendered reports.

4

Civil practice and remedies code section 74.351 provides that within 120 days of filing suit, a plaintiff must serve expert reports for each physician or health care provider against whom a liability claim is asserted. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (West 2011). An expert report is a written report by an expert that provides a fair summary of the expert's opinions regarding the applicable standard of care, the manner in which the care rendered by the physician or health care provider failed to meet the standard, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6). If a claimant timely furnishes an expert report, a defendant may file a motion challenging the report's adequacy. *Id.* § 74.351(a), (c), (*l*). A trial court must grant a motion to dismiss based on the alleged inadequacy of an expert report only if it finds, after a hearing, "that the report does not represent an objective good faith effort to comply with the definition of an expert report" in the statute. *Id.* § 74.351(*l*).

The information in the report does not have to meet the same requirements as evidence offered in a summary judgment proceeding or at trial, and the report need not marshal all of the plaintiff's proof. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878–79 (Tex. 2001) (stating that the "plaintiff need not present evidence in the report as if it were actually litigating the merits"). But an expert report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort: the report must (1) inform the defendant of the specific conduct the plaintiff has called into question and

5

(2) provide a basis for the trial court to conclude that the plaintiff's claims have merit. *Id.* at 879. A report does not fulfill these two purposes if it merely states the expert's conclusions. *Id.*; *see Bowie Mem'l Hosp.*, 79 S.W.3d at 53. The expert must explain the basis for his statements and must link his conclusions to the facts. *Baylor Univ. Med. Ctr. v. Rosa*, 240 S.W.3d 565, 570 (Tex. App.—Dallas 2007, pet. denied). A report that fails to explain how a breach caused injury is reasonably determined to be conclusory. *Bowie Mem'l Hosp.*, 79 S.W.3d at 53. Further, a trial judge may not draw any inferences but must rely exclusively on the information contained within the four corners of the report. *Id.*; *see Collini v. Pustejovsky*, 280 S.W.3d 456, 462 (Tex. App.—Fort Worth 2009, no pet.) (stating that court may not fill gaps in report by drawing inferences or guessing what expert likely meant or intended).

Regarding the standard of care for Labor and Delivery nursing staff under the circumstances in this case, Dr. Gayle opined in part,

3)   The L&D nurse is expected to review the prenatal records for problems and correlate these findings to the labor and delivery process. The nurse should understand the clinical significance of protracted labor disorders, particularly when the patient has documented concerns for size of pelvis. . . .

4)   The L&D nurse is expected to be a patient advocate and understand hospital chain of command policies. In the event that a nurse identifies a clinical scenario that would jeopardize the well-being of a mother or baby, the nurse is expected to advocate for a change in the medical plan. . . . The nurse should advocate a change in the medical plan by utilization of the hospital chain of command. . . .

6

5)      The L&D nurse is expected to have a basic working understanding of the indications and contraindications for operative vaginal deliveries, including the use of vacuum extraction and forceps. . . .  The use of vacuum extraction and forceps are contraindicated in a patient with a dysfunctional labor, arrest of descent[,] and a narrow pelvis.  The use of BOTH vacuum extraction and forceps in an operative vaginal delivery are also contraindicated. . . .[5]

Dr. Gayle opined that Nurse Robinson breached the applicable standards of care in part because she "did not appreciate the significant and dangerous risk created by a long and protracted labor and arrest of descent[] in a patient with clearly documented concerns about the size of the pelvis"; did not "request an open discussion of the medical plan with the attending physician" and, if necessary, implement the hospital chain of command; and did not "realize the contraindications of proceeding with operative vaginal delivery in a patient with protracted labor curve[] and arrest of descent."[6]

---

[5]A contraindication is "an indication, symptom, or condition that makes inadvisable a particular treatment or procedure."  Webster's Third New Int'l Dictionary 495 (3d ed. 2002).

[6]Nurse Hoffman opined similarly regarding WRMC's breach of the applicable standards of care, concluding as follows:

1.      The Labor and Delivery nurses at [WRMC] failed to recognize the clinical significance of the long and protracted labor curve. . . .  Despite the documented long and protracted labor, the nursing staff did not advocate any change in the medical plan of care by failing to implement the hospital's chain of command policy.

2.      The Labor and Delivery nurses caring for [Lea] failed to appreciate the significance of the well documented "narrow pelvic arch" and "a prominent pubic arch" . . . as documented

7

After setting out how WRMC breached the applicable standards of care, Dr. Gayle identified how the nursing care caused Appellees' injuries as follows:

NURSING CARE CAUSATION OPINION

If the L&D nursing staff at the hospital had complied with the standard of care, [Brandon] would have been delivered via c-section. If a c-section had been p[er]formed, the brain injuries suffered by [Brandon] during the operative vaginal delivery p[er]formed by Dr. Cardenas would have been avoided. [Brandon] suffered a skull fracture, epidural and subdural hemorrhages, facial lacerations, and a massive cephalohematoma. These brain injuries sustained by [Brandon] were caused by the use of vacuum extractor x3 and forceps in a patient with clear evidence of arrest of descent, a dysfunctional progress of labor[,] and a contracted pelvis.

Simply put, Dr. Gayle opined that had the nursing staff appreciated the significant risk to Brandon associated with Lea's protracted labor and arrest of descent, realized the contraindications of proceeding with operative vaginal

by the attending physicians . . . . Of equal significance was the fact that the nurse noted in [her] own nursing documentation that the baby was "not descending well" in [the] birth canal despite "good pushing efforts" by [Lea]. . . . All these factors, individually and collectively, clearly would have prompted a [L]abor and [D]elivery nurse to have a discussion or conference with the attending physician to question the safety and/or efficacy of continuing with a Pitocin augmentation or about the possibility of a cephalopelvic disproportion and the need for a cesarean section delivery.

3. In light of the dysfunctional labor progress and the protracted descent of the fetal head, the Labor and Delivery nurses caring for [Lea] failed to recognize and appreciate the contraindications for a vacuum extraction or subsequent forceps delivery and should have prompted her to request a conference with the physician, and charge nurse, or to implement the hospital chain of command to discuss whether to proceed with attempting an operative vaginal birth . . . .

8

delivery in light of the circumstances, and either requested an open discussion of the medical plan with the attending physician or implemented WRMC's chain of command, Brandon would not have suffered brain injuries because he would have been delivered by cesarean section instead of having been delivered vaginally with a vacuum extractor and forceps. Dr. Gayle explained the basis for his opinions and satisfactorily linked WRMC's purported breaches of the standards of care to Appellees' injuries. *See Rosa*, 240 S.W.3d at 570. The trial court did not have to infer anything.

WRMC argues that Dr. Gayle's causation opinion is inadequate because he speculates and infers that Dr. Cardenas would have to have taken the nursing staff's "word for it" and chosen to perform a cesarean section instead of a vaginal delivery. But section 74.351 does not prohibit *experts*, as opposed to courts reviewing expert reports, from making inferences based on medical history. *See Benish v. Grottie*, 281 S.W.3d 184, 195 (Tex. App.—Fort Worth 2009, pet. denied) (citing rules of evidence 703 and 705); *see also Bowie Mem'l Hosp.*, 79 S.W.3d at 53. WRMC does not challenge Dr. Gayle's qualifications to opine on causation in this appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.403 (West 2011). Nor does WRMC challenge Dr. Gayle's opinion that "[t]he diagnosis of cephalopelvic disproportion[] clearly applies here[] and is a contraindication to operative vaginal delivery of any means." Considering Lea's medical history, including her clear diagnosis of cephalopelvic disproportion, the protracted labor, the arrest of descent, and the documented concerns about the size of her pelvis,

9

and in light of Dr. Gayle's unchallenged qualifications, he is not precluded from concluding that Dr. Cardenas—or some other physician if the nursing staff had implemented WRMC's chain of command policy—would have performed a cesarean section instead of a vaginal delivery had the nursing staff not breached the applicable standards of care. *See, e.g., Univ. Med. Ctr. v. Ward*, No. 07-07-00046-CV, 2007 WL 2403361, at *2–3 (Tex. App.—Amarillo Aug. 23, 2007, no pet.) (mem. op.) (overruling appellant's challenge on causation grounds to expert's opinion "that if the nurses had timely recognized the symptoms associated with cord compression and taken the stated measures, there is a high likelihood that the fetus would have been delivered by [c]esarean section 'alive and intact'").

Moreover, this is not an appeal involving a post-discovery summary judgment proceeding, nor is it an appeal challenging a jury's findings after a trial on the merits. The trial court could have reasonably concluded that Dr. Gayle's report provides enough information to inform WRMC of the specific conduct that Appellees have called into question and to provide a basis for the trial court to conclude that Appellees' claims have merit. *See Palacios*, 46 S.W.3d at 879. Dr. Gayle's report thus constitutes a good-faith effort to fairly summarize his opinions about the causal relationship between WRMC's alleged breaches of the applicable standards of care and Appellees' injuries. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*), (r)(6). We hold that the trial court did not abuse its

discretion by denying WRMC's motion to dismiss. We overrule WRMC's only issue.

## IV. CONCLUSION

Having overruled WRMC's sole issue, we affirm the trial court's order.


BILL MEIER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and MEIER, JJ.

DELIVERED: June 23, 2011

11